1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LYNNE BRAY,

               Plaintiff,

   v.

KING COUNTY, et al.,

               Defendants.

CASE NO. C06-1059JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on Defendants' motion for summary judgment (Dkt. # 18).  The court finds this motion suitable for disposition based on the briefing, declarations, and exhibits that each party provided.  For the reasons stated below, the court GRANTS Defendants' motion for summary judgment.

## II.  BACKGROUND

### A.    Ms. Bray's Employment with the County

Plaintiff Lynne Bray was employed in the Road Division for Defendant King County Department of Transportation ("the County").  Ms. Bray began working for the County as an utility worker in April 1991.  Bray Decl. ¶ 2.  In November 1998, the

ORDER – 1

County promoted Ms. Bray to Utility Worker Crew Chief, which required her to assign work to other Road Division employees; investigate citizen road complaints; and arrange for the personnel, material, and equipment to make road repairs.  Id. at ¶ 3.  Ms. Bray's employment with the County was unremarkable until March 2000, when she was in a motor vehicle accident while driving a vehicle owned by the County.  Id. at ¶ 4.  Ms. Bray suffered lower back and shoulder injuries as a result of the accident and was out of work for approximately five months.  Id. at ¶¶ 4-5.

Ms. Bray returned to full-time work in August 2000, with some lifting restrictions imposed by her physician.  Id.  Ms. Bray's physician lifted these restrictions in December 2001, and Ms. Bray returned to unrestricted duty at this time.  Although she was permitted to return to work full-time and without limitations, the County's worker's compensation carrier rated Ms. Bray as having a permanent partial disability in her back. Id. at ¶ 6.  After the accident, during the 2000 to 2001 time frame, Ms. Bray struggled with attendance issues and, in September 2001, the County issued Ms. Bray her first letter of counseling regarding her attendance.  Id. at ¶ 8.  The letter required that Ms. Bray provide a written statement from a health care professional to document days she missed work due to health issues.  Id.  Her then supervisor, Roderick Matsuno, complaining about Ms. Bray's low sick leave balance, counseled her that it was important for her to maintain a certain amount of sick leave in her account.  Id. at ¶ 9.  According to Ms. Bray, her sick leave account had dwindled as a result of her injuries from the March 2000 accident.  Id. at ¶ 10.

By December 2001, Ms. Bray had not improved her attendance; she received a second letter of counseling from Ross Pettit, her direct supervisor.  Id. at ¶ 11.  Ms. Bray did not believe that the most recent sick leave policy should apply to her because she had required extended leave due to her March 2000 accident.  Id.  Mr. Pettit did not exempt Ms. Bray from the sick leave policy, however, and placed her on a one-year Performance

ORDER – 2

Improvement Plan aimed at improving her attendance.  Id. at Ex. 4.  Mr. Pettit predicated the plan on the fact that "[p]redictable and reliable attendance is an essential function of the Crew Chief position."  Id.  The plan did not preclude Ms. Bray from taking sick leave to care for herself or her child, it only required that such leave be supported by a note from a health care provider.  Id.

**B.    Ms. Bray Suffers Personal and Health Issues**

In 1993, Ms. Bray married Robert Estrin, a co-worker of hers in the Roads Division.  Bray Decl. ¶ 13.  The two separated in 1999, and were divorced in 2001.  Id. Ms. Bray contends that after their divorce, Mr. Estrin began to spread rumors that Ms. Bray was a lesbian.  Id.  While Ms. Bray did not contest the allegation, she felt it was a private matter and not information she wanted discussed among her co-workers.  Id.  Ms. Bray complained to her supervisors about Mr. Estrin's behavior.  Id.  Ms. Bray contends that, shortly after complaining about Mr. Estrin, upper management began treating her differently.  Id.  For example, after assisting in the disciplinary investigation of two openly lesbian coworkers, one of Ms. Bray's supervisors made the comment that Ms. Bray was a "crew lead" rather than a "management lead."  Id.  Additionally, Ms. Bray contends that her assignments changed in order to "alienate her from [her] crew."  Id. at ¶ 14.

During this time Ms. Bray began to suffer from depression, and in fall 2002, her physician prescribed antidepressant medication.  Id. at ¶ 17.  Ms. Bray's general health worsened over the next year.  In November 2002, Ms. Bray sought tests and treatment for headaches and intestinal problems.  Id.  In February 2003, Ms. Bray had some lumps tested with a CT scan, and in April 2003, Ms. Bray was admitted to the emergency room with severe night sweats and headaches.  Id. at ¶ 19.  All of these health problems caused Ms. Bray to miss work, and in January 2003, the County put her on a second Performance Improvement Plan, this one for six months, which was later extended an

ORDER – 3

additional three months.  Id. at Exs. 5-6.  In April 2003, Ms. Bray told her supervisor, Mr. Pettit, that she was being treated for depression, and that she was having some personal problems.  Id. at ¶ 23.  Ms. Bray never claimed to be disabled as a result of these health problems, and never requested that the County accommodate her disability by permitting her to work an intermittent schedule or to arrive later than her scheduled start time. Momohara Decl. ¶ 7.

In July 2003, Mr. Pettit reprimanded Ms. Bray for being consistently late to work. Ms. Bray contends that on many of these occasions she was late due to health issues, including headaches and irritable bowel syndrome.  Id. at ¶¶ 24-25.  Ms. Bray also contested the reprimand because, "on the overwhelming majority of days," she arrived on time for her scheduled shift.  Id. at ¶ 25.  Ms. Bray considered Mr. Pettit's requirement that she arrive 15 minutes before the start of her scheduled shift to be unjustified.[1]  Id.

**C.    The County Ombudsman Receives a Citizen Complaint Regarding Ms. Bray and Discovers Excessive Personal Use of County Property**

In July 2003, the County Ombudsman received a citizen complaint from Ms. Bray's former girlfriend, Jennifer Bond, complaining that Ms. Bray was using her the County work computer to send and receive private e-mails and that Ms. Bray was using the County vehicle for personal use.  Momohara Decl. ¶ 8.  Ms. Bond also accused Ms. Bray of visiting Ms. Bond's home during work hours, and that she was drinking beer at Ms. Bond's house while on duty for the County.  Arima Decl. ¶ 4.  In response to the complaint, Alan Momohara, Roads Maintenance Managing Engineer and the person responsible for human resources management, commenced an investigation into Ms. Bray's use of the County's property.  Momohara Decl. ¶ 11.  During the investigation, Mr. Momohara discovered that Ms. Bray had sent or received over 600 personal emails

---

[1]According to the County, all Crew Chiefs in the Roads Division are required to arrive 15 minutes before their crews so they can prepare to dispatch work when the crews arrive. Momohara Decl. ¶ 4.  Crew Chiefs are compensated for this time.  Id.

ORDER – 4

during the time period of April 1, 2003 through July 24, 2003.  Id.  For example, Ms.
Bray sent or received over 50 personal emails in a three-hour period on April 16, 2003,
during which time, Ms. Bray was on duty for the County.  Id.  These clusters of emails
occurred on numerous occasions during this time period.[2]  Id.  The majority of these
emails were between Ms. Bray and Ms. Bond, her girlfriend at the time.  Id.  The
majority, if not all, of the messages were sent during Ms. Bray's scheduled shift for the
County.  Id.  Moreover, Mr. Momohara discovered that Ms. Bray repeatedly texted or
called Ms. Bond several times during the work day.  Id.  Mr. Momohara also determined
that Ms. Bray had used the County vehicle for personal use by driving it to Ms. Bond's
residence, while at the same time charging her mileage to and from her home to the
County.  Id. at ¶¶ 12-13.

In June 2003, the County appointed Defendant Deborah Arima to be the acting
manager for the Road Division.  Arima Decl. ¶ 2.  Prior to that time, Ms. Arima had not
met Ms. Bray, nor does she recall ever reviewing Ms. Bray's personnel file.  Id.  In
August 2003, Ms. Arima reviewed Mr. Momohara's findings regarding Ms. Bray's use of
the County's property and concluded that Ms. Bray's conduct violated the King County
Ethics Code regarding the use of the County's equipment and time, as well as violating
guidelines issued by the Director of the King County Department of Transportation,
Harold Taniguchi, for all Department of Transportation employees.  Id. at ¶ 5.  Based on

---

[2]Mr. Momohara noted the following clusters of personal emails sent or received by Ms.
Bray: April 21, 2003, Ms. Bray sent or received 27 personal emails in less than a three hour time
period; April 25, 2003, Ms. Bray sent or received 35 personal emails in less than a two hour time
period; May 6, 2003, Ms. Bray sent or received approximately 80 personal emails during her
work day; May 7, 2003, Ms. Bray sent or received over 80 personal emails in less than a four
hour time period; May 14, 2003, Ms. Bray sent or received 61 personal emails in less than a two
hour time period; and May 22, 2003, Ms. Bray sent or received 45 personal emails during the day.
Momohara Decl. ¶ 11.  Mr. Momohara also noted the use of profanity in a number of Ms. Bray's
personal emails, which is prohibited by King County email policy.  Id.

ORDER – 5

these findings, Ms. Arima proposed that Ms. Bray be discharged from her employment with the County.  Id. at ¶ 6.

**D.      The County Discharged Ms. Bray From Employment**

On August 19, 2003, Ms. Arima wrote Ms. Bray informing her of the findings of the investigation into Ms. Bond's complaints, and of her recommendation that Ms. Bray's employment be terminated.  Arima Decl. Ex. A.  Ms. Arima based her recommendation on (1) Ms. Bray's inappropriate use of the County's computer, including sending and receiving emails of a sexual nature and using profanity in the emails; (2) inappropriate use of the County's vehicle; (3) inappropriate use/theft of the County's time; (4) providing information regarding the County's employees to nonemployees;[3] and (5) Ms. Bray's dishonesty in her response to the investigation.  Id.  Ms. Arima scheduled a meeting for August 22, 2003, in which Ms. Bray was given the opportunity to respond to the allegations contained in Ms. Arima's proposed termination letter.  Id.  Ms. Bray attended the meeting with her union representative.  Id. at Ex. B.

According to Ms. Arima,[4] during the meeting, Ms. Bray requested leniency given her years of service to the County, and stated that she had been a valued employee during the last 12 years.  Id.  Ms. Arima responded that, indeed there had been times in the past wherein Ms. Bray demonstrated good leadership skills and judgment, "[h]owever, [Ms. Bray's] ability to have predictable and reliable attendance has been an issue for some time."  Id.  Ms. Arima noted that, in December 2001, Ms. Bray had been placed on a Performance Improvement Plan to address these issues because her "erratic attendance placed a strain on [her] supervisor and the other Crew Chief[s] . . . ."  Id.  Ms. Arima,

---

[3] Ms. Bray sent Ms. Bond, a nonemployee, a list of King County employees in her division, as well as her ex-husbands' two-way radio handle.  Arima Decl. Ex. A.

[4] Ms. Bray does not offer evidence to refute Ms. Arima's account of the meeting.

ORDER – 6

however, did not rely on Ms. Bray's attendance issues as the basis for Ms. Bray's termination.  Id.

After investigating additional issues Ms. Bray raised in the August 22 meeting, Ms. Arima met with her supervisor, Linda Dougherty, Director of the Road Services Division, to discuss the future of Ms. Bray's employment with the County.  Id. at ¶ 7. Ms. Dougherty and Ms. Arima made the decision to terminate Ms. Bray's employment effective September 2, 2003.  Id.  Ms. Arima memorialized the reasons for Ms. Bray's termination in a September 2, 2003 letter to Ms. Bray, which, except for responding to Ms. Bray's arguments at the meeting, was identical to her August 19 letter.  Id., Ex. B. At the time of Ms. Bray's termination, neither Ms. Arima nor Ms. Dougherty were aware of Ms. Bray's alleged disability.  Arima Decl. ¶ 11; Dougherty Decl. ¶ 2.

Ms. Bray unsuccessfully grieved her discharge in accordance with her union's collective bargaining agreement.  Arima Decl. ¶ 9.  She declined to arbitrate her termination, however.  Id.  Instead, over two-years later, Ms. Bray filed the instant lawsuit against the County and Ms. Arima claiming (1) disability discrimination pursuant to the Washington Law Against Discrimination ("WLAD"), Revised Code of Washington § 49.60.180; and (2) violation of her equal protection rights, based on her sexual orientation, pursuant to the Fourteenth Amendment, and 42 U.S.C. § 1983.  Compl. at 3. Ms. Bray later clarified that her only claim against Ms. Arima is for disability discrimination.  Resp. at 20.

## III.  ANALYSIS

### A.    Summary Judgment Standard.

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the

ORDER – 7

initial burden of showing there is no material factual dispute and he or she is entitled to prevail as a matter of law.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by producing evidence that negates an essential element of the non-moving party's case, or (2) after suitable discovery, by showing that the non-moving party does not have enough evidence of an essential element to carry its burden of persuasion at trial.  Id. at 322-23; see also Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden, the opposing party must present evidence to support its claim or defense.  Cline v. Indust. Maint. Eng'g. & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000).  For purely legal questions, summary judgment is appropriate without deference to the non-moving party.

**B.    Ms. Bray Does Not Set Forth a Prima Facie Case of Discrimination**

Ms. Bray asserts a claim for discriminatory discharge on the basis of disability (i.e., disparate treatment) against the County and Ms. Arima under RCW § 49.60.180. Washington courts have largely adopted the federal evidentiary burden-shifting protocol for evaluating motions for summary judgment in discrimination cases where the plaintiff lacks direct evidence of discriminatory animus.[5]  See, e.g., Hill v. BCTI Income Fund-I, Inc., 23 P.3d 440, 446 (Wash. 2001), abrogated on other grounds by McClarty v. Totem Elec., 137 P.3d 844 (2006).  Under this framework, Ms. Bray first bears the burden of setting

---

[5]To the extent Ms. Bray argues that the notation in the September 2003 letter of termination regarding her attendance problems is direct evidence of disability discrimination, the court finds this evidence to be insufficient.  "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption."  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (citing Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir. 1994) (alterations in original, quotations and citations omitted)).  The court finds that no reasonable jury could find a discriminatory animus in Ms. Arima's factual reference to Ms. Bray's prior attendance issues.

ORDER – 8

forth a prima facie case of unlawful discrimination, demonstrating (1) disability;[6] (2)
discharge; (3) satisfactory work performance; and (4) replacement by a non-disabled
worker, or a non-disabled worker was not discharged for engaging in similar conduct.
See Reil v. Foodmaker, Inc., 94 P.3d 930, 938 (Wash. 2004); Becker v. Cashman, 114
P.3d 1210, 1214 (Wash. Ct. App. 2005).  Taking every inference in Ms. Bray's favor, as
the court must for purposes of these motions, the court cannot find that Ms. Bray has
successfully set forth a prima facie case of unlawful discrimination.  Ms. Bray's
deficiency lies in the fourth prong of her prima facie case.  That is, she has not offered
any evidence that a non-disabled worker was treated better than her.

     Ms. Bray cites to the conduct of the County worker, Tommy Burdette, which led
to a short termination of his employment, as evidence of disparate treatment.  Ms. Bray
contends, with out citation to the record, that in 2001, Mr. Burdette sexually harassed an
employee, misused the Internet during work hours, stopped at the home of a female
employee during the work day, abused sick leave, and drove his County vehicle without a
license.  Resp. at 16.  Yet, according to Ms. Bray, Mr. Burdette was only suspended for
ten days due to these activities.  Id. at 17.  The uncontroverted evidence in the record
does not support Ms. Bray's allegations.  While Mr. Burdette was initially suspended for
ten days in September 2001, less than a month later his employment with the County was
terminated.  Devereux Decl. Ex. A.  If Mr. Burdette was reinstated, and nothing in the
record supports this finding, it was only after he grieved his termination through the

---

     [6]During briefing on this motion, the Washington Legislature amended the WLAD's
definition of disability.  RCW § 49.60.040, 2007 Wash. Legis. Serv. Ch. 317 (S.S.B. 5340).
Although the amendment was approved on May 4, 2007, and becomes effective as of the date of
this order, July 22, 2007, the Washington Legislature explicitly stated that the amendment was to
apply retroactively to all causes of actions occurring before July 6, 2006.  While no Washington
court has had the opportunity to address the retroactivity of this amendment, Defendants
nevertheless concede that, for purposes of this motion, Ms. Bray meets the definition of disabled
under the WLAD.

ORDER – 9

arbitration process – a process Ms. Bray declined to participate in after her own termination.  More importantly, Mr. Burdette's termination letter indicates that he suffered from his own disability: alcoholism.  Id. at ¶ 2.  Thus, the evidence before the court is that Mr. Burdette suffered the same consequence as Ms. Bray and was also in the protected class.  Finally, Mr. Burdette was not similarly situated to Ms. Bray because he was a field-level employee that was not responsible for leading, directoring or assigning work to other employees.  Slonecker Decl. Ex. A ("Dougherty Dep.") at 42-43.  Finally, Mr. Burdette's suspension and termination were authorized by Lydia Reynolds-Jones, a decision-maker not involved in Ms. Bray's termination.  Accordingly, because Mr. Burdette was not similarly situated to Ms. Bray and was actually in the protected class himself, the court concludes that Ms. Bray fails to establish a prima facie case of discrimination.

**C.      Even If Ms. Bray Could Establish a Prima Facie Case of Discrimination, There is no Evidence That the County's Stated Reason for her Termination was Pretextual**

Assuming Ms. Bray could come forth with sufficient evidence to establish a prima facie case of unlawful discrimination, the burden of production shifts to the County to provide a nondiscriminatory reason for the employee's discharge.  Becker, 114 P.3d at 1214.  If the County meets this burden, the presumption of unlawful discrimination is rebutted and the burden shifts back to Ms. Bray to show that the County's stated reason for her discharge was in fact pretext.  Id.

Defendants come forth with undisputed evidence that Ms. Bray engaged in excessive and inappropriate use of the County's property.  According to it, this was the sole legitimate, nondiscriminatory reason for Ms. Bray's discharge.  The court therefore concludes that Defendants have met their burden of production.  As such, the burden shifts back to Ms. Bray to show that the County's stated reason for the discharge was merely pretextual.

ORDER – 10

Ms. Bray contends that there is substantial evidence that "the decision to terminate [her] employment was motivated in part by the attendance problems that she had that were caused by her disability . . . ." Resp. at 11. Ms. Bray's sole support for this contention is that in Ms. Arima's seven-page letter terminating Ms. Bray's employment, Ms. Arima responded to Ms. Bray's statement that she has been a valued employee for over 12 years by pointing to the fact that Ms. Bray's employment had not been without some problems. In doing so, Ms. Arima pointed out that Ms. Bray had been reprimanded for attendance issues in the past. Ms. Arima's reference to attendance in the letter is only in response to Ms. Bray's own contention of flawless past performance, and when viewed in light of the many stated reasons for Ms. Bray's termination, it does not support a finding that the reason given for her termination was pretextual. More importantly, Ms. Bray admits that her personal use of the County's email system was "excessive" during July 2003, and that she violated the County's policy by taking her service vehicle to Ms. Bond's residence. Stockdale Decl. Ex. A ("Bray Dep.") at 70, 83. Ms. Bray also admits that she knew her email was not to be used for excessive personal use. Bray Dep. at 69.

Ms. Bray attempts to show pretext by alleging that her termination was motivated in part by her absenteeism, which was caused by her disability. Yet, she offers no evidence that either of the decision-makers in this case were aware of her alleged disability. Indeed, her own evidence shows that during the relevant time period she informed her direct supervisor that her absenteeism was caused by problems in her personal life and "roommate troubles." Resp. at 13-14. And, although she claims to have told her supervisor that she was suffering from depression, she does not allege that this

ORDER – 11

was the cause of her absenteeism.[7]  Id.  Given that Ms. Bray admits to much of the conduct leading to her termination, and that the County's stated reason for her termination did not rest on her prior absenteeism, the court concludes that Ms. Bray fails to come forth with sufficient evidence to support her allegation of pretext.  Because Ms. Bray fails to set forth either a prima facie case of discrimination or some evidence to support pretext, the court dismisses her disability claim in its entirety.

**D.      The County is not Liable Pursuant to Section 1983**

Ms. Bray claims that the County, through its policy-maker, Linda Dougherty, violated Ms. Bray's right to equal protection under the Constitution, when it treated her differently than other similarly situated individuals based on her sexual orientation. Section 1983 creates a remedy for an individual who suffers a violation of rights under the Constitution or other laws at the hands of a person acting under the color of state law. 42 U.S.C. § 1983.  In order for such liability to attach to the County, however, Ms. Bray must come forth with some evidence that her termination was the result of a County policy, custom or practice that allows for discrimination based on sexual orientation.  See Monell v. Dep.t of Social Serv., 436 U.S. 658, 694 (1978); see also Gibson v. United States, 781 F.2d 1334, 1337 (9th Cir. 1986) (holding that a local government entity cannot be held liable under § 1983 unless the plaintiff alleges "that the action inflicting injury flowed from either an explicitly adopted or a tacitly authorized [governmental] policy").  Here, Ms. Bray makes no allegation that Ms. Arima's or Ms. Dougherty's decision to terminate her employment flowed from a County policy, custom or practice

---

[7]Ms. Bray's counsel argues that "Ms. Bray specifically told her supervisor that she was being treated for depression and was having personal problems affecting her attendance."  Resp. at 13-14.  Thus, counsel's own argument suggests that Ms. Bray's personal problems were affecting her attendance, and not her medical conditions.

ORDER – 12

that allows for discrimination based on sexual orientation.  Ms. Bray instead argues that Ms. Dougherty is a "final policy-maker" for purposes of § 1983 liability.

"Final policy-maker" liability is based on the Supreme Court's recognition that an official's decision may constitute "official policy" in some circumstances.  See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 738 (1989).  Whether someone is an "official" is a question of state law.  Id.  Here, although it is undisputed that Ms. Dougherty was the *decision-maker*, Ms. Bray offers no evidence that Ms. Dougherty is a *policy-maker* for employment practices for the County.  The fact that Ms. Dougherty and Ms. Arima have authority to hire and fire County employees does not make them policy-makers for Monell liability.  See Pembauer v. Cincinnati, 475 U.S. 469, 482-83 (1986). In Pembauer, the Court explained the distinction as:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.  The fact that a particular official-even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.  Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

Id. at 483 (footnotes and citations omitted).  Thus, in Pembauer, the Court explained that, although the county sherif may have discretion to hire and fire employees, he is not the policy-maker for establishing municipal liability.  Id.  The Court found that the sherif was not responsible for establishing county employment policy; this responsibility was vested in the Board of County Commissioners, and only that body's decision would be a basis for county liability.  Id. at 483 n.12.

Similar to the Court's example in Pembauer, the evidence before this court is that, although Ms. Dougherty, and Ms. Arima for that matter, are given the authority to make personnel decisions for the County, they are not vested with the responsibility for

ORDER – 13

1   promulgating employment policy for the County.  Only the King County Executive and

2   the County Council can set County employment policies regarding personnel rules.  See

3   King County Charter § 520.[8]  Moreover, the court notes that Ms. Bray offers no evidence

4   or argument that supports a finding that Ms. Arima's decision to terminate her

5   employment was based in any manner on Ms. Bray's sexual orientation.[9]  For these

6   reasons, the court grants Defendants' motion for summary judgment on Ms. Bray's

7   Section 1983 claim.

## IV.  CONCLUSION

9           For the reasons stated above, the court GRANTS Defendants' motion for summary

10  judgment (Dkt. # 18).  The court directs the clerk to enter judgment consistent with this

11  order.

12          Dated this 22nd day of July, 2007.

13

14

15                                                        _____

16                                                        JAMES L. ROBART
                                                          United States District Judge

17

18

19  _____

20          [8]Section 520 of the King County Charter provides:

21          The county executive shall administer the personnel system of the county in
22          accordance with the personnel rules adopted by the county council by ordinance.
            The county administrative officer shall prepare and present proposed personnel rules
23          to the county executive who shall present a proposed ordinance establishing the
            personnel rules to the county council which shall adopt the ordinance with or
24          without amendments.

25          [9]Ms. Bray again offers Mr. Burdette's suspension and termination as evidence of disparate
26  or unequal treatment.  The court addressed previously why Mr. Burdette is not a similar situated
    employee.  In addition, however, Ms. Bray, in arguing that she was singled out because she is a
27  lesbian, does not offer the court any evidence that Mr. Burdette is heterosexual.

28

ORDER – 14